## Case No. 5,856.

### GUIBERT et al. v. The GEORGE BELL.

[3 Hughes, 468.][1]

District Court, D. Maryland.  March, 1879.

SHIPPING—RULES OF NAVIGATION—SAILING IN FOG—FAULTS.

1. The statutory rules of navigation, as to fog-bells and fog-horns, must not be construed to excuse the faults of bad seamanship.

2. A vessel must not sail in a fog with too much canvas to allow of prompt manoeuvring to avoid collision with craft lying at anchor.

3. The presumption of fault is conclusive against vessels sailing with too much canvas in a fog in fishing waters, and colliding with vessels at anchor, where there is no vis major.

[Libel by Nathaniel Guibert & Sons against the British ship George Bell, for collision.]

Brown & Brune, for libellants.
Brown & Smith, for respondents.

HUGHES, District Judge.  This is a libel of a British ship by citizens of the French Republic, for damages sustained from a collision on the high seas.  It is a case purely international, and is to be determined by the principles of general law applicable to torts in admiralty.  France and England, as well as the United States and all maritime states of any repute, have adopted, as a part of the general admiralty law, a well-known series of rules of navigation for the prevention of collisions at sea.  The regulations thus generally adopted had been first promulgated by act of the British parliament in 1862.  Though statutory, they are an international code, obligatory upon all mariners, which the admiralty courts of the world are bound to enforce.  Before stating such of these rules as govern the present case, I will set out the leading facts of the collision which is the subject of this libel, as I have gathered them from the voluminous, and in many respects conflicting testimony which has been read at bar from depositions taken on either side.  The French brig Briha, a fishing vessel of 130 tons, was anchored on the Grand Bank of Newfoundland, latitude 45° 54′, longitude 52° 43′, on the 9th of August last, with a crew of twenty-one men.  At half-past five o'clock on that morning, one hour after sunrise, she was run into by the British ship George Bell of 1100 tons, and sunk with all the effects on board, and the loss of two of her crew.  At half after four she had sent out her two fishing boats, each with seven men, on their daily duty of examining the lines which were used, in their business, and which were attached to buoys set at distances of half a mile to a mile or more on each side of the vessel.  Seven men remained on the brig, among whom was the captain.  These were all on deck after the departure of the boats.  There was a breeze from the southwest, and the brig at anchor was heading to that point.  There was a pretty heavy fog, but it was not so dense as to prevent an object as large as the brig from being seen at a distance of three hundred yards or more, an hour after sunrise.  At a moment five to ten minutes before half-past five, the men on deck of the brig saw in the direction of the sun, a ship, apparently under full sail, heading N. by W., making directly towards them.  Under the master's direction, one of them rang the bell, and another began to blow the fog-horn, to give warning to the ship.  She seemed to pay no attention to these signals, took down no sail, and made no manoeuvre to change her course; but came on bearing right across the brig.  She was on the port tack and close-hauled within six or seven points of the wind.  The men on the brig became more and more alarmed, blew the horn, and rang the bell repeatedly, and in addition shouted and gesticulated with all their might.  But the ship came steadily on without changing her course or slacking her speed until within a few yards of the brig, when she paid off to the starboard, thereby, instead of striking the brig amidships, striking her on her port-quarter at an angle of about forty-five degrees.  The collision was at half-past five, an hour after sunrise.  The brig foundered and sank in the course of twenty or thirty minutes, carrying down all she had on board, including the men's clothing.  The ship passed on for half a mile, or a mile or more, and then hove to.  A raft was constructed by the men on board the brig, on which all saved themselves but two.  These two were drowned and lost.  The rest of the crew were taken up by the colliding vessel, which proved to be the British ship George Bell, and by another vessel which was passing near, and which proved to be the British ship St. George.  When the George Bell struck the brig, her master did not suppose any serious damage had been done; and his ship passed on for some distance until the brig was left out of sight.  But just then there was a sudden lifting of the fog, when the master of the ship, discovering that the brig was in distress, hove his vessel to, and sent assistance.

Such are the leading facts of the case.  It was a collision in the open sea, in daylight, by a ship under full sail, with a vessel at anchor.  Prima facie, the ship is liable for the damages; but the defence set up by the respondent is: (1) Fault on the part of the brig in not having rung her bell before the collision, as required by rule 10 of the British regulations (our American rule 15) of vessels at anchor in a fog; and (2) inevitable accident, in that the ship had not timely warning from the brig's fog-bell of the brig's position.

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

I will· first state the law applicable to such cases as this. It is well settled by the courts, that where a collision happens between a vessel under way and another at anchor, the presumption of fault is against the vessel in motion, and that the burden is upon her of proving fault in the other vessel. Bill v. Smith, 39 Conn. 206; Pars. Mar. Law, 201; The Lady Franklin [Case No. 7,984], and numerous cases, English and American, there cited. In the case of The Granite State, 3 Wall. [70 U. S.] 310, the supreme court of the United States go as far as to say, nem. con., that where there is no vis major, the fact of collision with a stationary vessel is conclusive evidence of fault on the part of the moving vessel, and this is undoubtedly the law whenever the stationary vessel is where she has a right to be. It is true that rule 10 (our rule 15) requires vessels at anchor in a fog to ring their bells every five minutes; but it is also true that if the failure to do so, in any particular case, is not proved by the moving vessel to have "contributed" to, that is, to have been the cause of the accident, then the moving vessel is liable, notwithstanding the failure. The rule of navigation in question is a general command to mariners emanating from the law-making power, and not a judicial determination in advance for every case of actual liability. Indeed, section 29 of the British mercuaut shipping amendment of 1862, requires, by necessary implication, that in case of collision, it shall be proved that the accident was in fact occasioned by the non-observance of the appropriate regulations, in order to fix liability upon the vessel not observing the rule. Moreover rule 20 provides that the statutory regulations shall not be construed as exonerating any vessel from the consequences of any neglect of any precautions which may be required by the ordinary practice of seamen or by the special circumstances of each case. And the supreme court of the United States in the case of The Grace Girdler, 7 Wall. [74 U. S.] 203, say, that the statutory rules of navigation shall not be construed to excuse the fault of bad seamanship, or warrant the neglect of any proper precautions by a vessel moving uuder circumstances requiring such precautions to be taken. Nay, more, rule 19 (our rule 24) authorizes the non-observance and violation of any particular rule where such departure is rendered necessary to avoid immediate danger.

In the light of the law thus explained, the case at bar depends upon two questions, viz.: (1) Did the brig neglect to ring her fog-bell as required by rule 10; and, if so, did that neglect in great or less degree cause the collision? and, (2) if not, did the collision occur in consequence of faulty management on the part of the ship, or by inevitable accident?

The weight of the evidence in this cause is to the effect that the night preceding the collision had been foggy and that the fog continued for more than an hour after sunrise. It was, therefore, the duty of the brig to ring her fog-bell every five minutes during the night and up to the time of the collision. I do not think she is proved to have done so during the night; but it is proved that she did so during the time the George Bell was within hearing of her bell. The ship was to windward of her, and it is proved that a bell in those waters does not sound as far to the windward as a horn. The brig's bell was sounded full five minutes before the collision; it was repeatedly sounded during the period of five minutes. The weight of evidence is to the effect that the ship was moving at the rate of five knots an hour, which was a rate that would place the ship seven hundred and thirty-three yards from the brig at the time she was first seen and the fog-bell was first rung. The ship being to windward, the brig's bell could not, according to the evidence, have been heard before that moment from the ship; and, therefore, so far as the ship could be affected, the ringing of the bell from that moment was in time to place the brig in compliance with rule 10. The brig did more than thus comply with that rule. She used the horn vigorously. She also, by the shouts and gesticulations of all on board, did everything in her power to warn off the ship. I ·hold, therefore, that for all the purposes of this case, the brig, even though she might have been technically in fault as to the night ringing, was not actually in fault as to ringing the bell in connection with this collision. As to this she gave warning to the colliding ship, not only by compliance with rule 10, but also in the most effectual modes which were at her command.

We come therefore to the crucial question in this case, namely, whether the accident was inevitable, or due to fault on the part of the ship. The accident occurred in the daytime. There was a pretty heavy fog. All the testimony of the brig's crew, and the testimony of some of the ship's crew, goes to prove that the two vessels were visible to each other for a period of five minutes before the collision. Captain Allen, of the ship, himself testifies that after passing by the brig, after the collision, he could see her through the fog for five or ten minutes before she became obscured from sight. He himself thereby confirms the brig's witnesses in their statement that the ship, before the collision, was seen for five minutes by. the brig's crew. I know that he also says the brig was only a few ship's lengths off from him when he lost sight of her five to ten minutes after the collision, but I cannot believe she was that near, for his vessel continued in motion under considerable headway and canvas, and was but little less susceptible of being checked in her course just after the collision than she had been just before that event. He must have gone several hundred yards beyond the brig before she ceased to

be visible in the fog, and before he hove to, "half a mile to a mile and a half" off. The testimony of three of the men who were on the ship's deck, Jacobson, Jepson, and Gibbons, is virtually to the effect that there was as much as five minutes of time between the moment when the two vessels became visible to each other and the moment of collision. Jepson says expressly that he heard the brig's bell ringing three to five minutes before the collision. I need not collate the declarations of the several witnesses on this point. True, on the other hand, there is testimony of other witnesses, who gave it as their opinion that in that fog, on that morning, objects could be seen only at such and such distances, which were very short. But this conjectural testimony is worth nothing against that of witnesses who state as a fact that they actually saw these vessels five to ten minutes before and after the accident. We are bound to act upon evidence of facts, and cannot safely trust to conjectures or vague and varying surmises. I feel bound to conclude on the whole that the vessels were visible to each other a full period of five minutes before the collision.

I am warranted by the evidence in assuming, further, that the ship was running at the rate of five miles an hour, for that is the teaching of the evidence, carefully sifted and weighed. Even if she had been running at as low a rate of speed as three miles an hour, she would have been four hundred and sixty yards distant from the brig at a moment five minutes before the collision. The ship was sailing close to the wind on the port tack, with all sails set except the maintopsails and the royals. There was a good breeze. The ship was in ballast, and it is hardly probable that with as much canvas as she had spread, she was moving at a much slower rate than five miles per hour. The St. George was going at the rate of three to four miles near by, with much less sail, namely, her two jibs, her mainsail, her topsails, and topgallant-sails, only. The case with the George Bell seems to me, therefore, to be this: The brig was lying broadside in her course, showing six feet above water, her sides painted black, with a white band four inches wide just under the rail, at a distance hardly less than three hundred yards, and probably as much as seven hundred yards from where the ship could have first seen her. This could have been five minutes before the moment at which the ship's speed would have brought her into collision, if her lookout had been in place. The ship was sailing at probably five miles an hour, with nearly all sails set. Such was the situation, and the question which presents itself is, whether the collision that occurred under such circumstances was the result of inevitable accident, or whether it was the result of faulty management or non-management on the part of the ship. I can-

not believe that the accident was inevitable. I am obliged to conclude from all the evidence that the ship could easily have avoided the brig but for inexcusable delay and negligence in taking the measures necessary in the emergency.

There has been much discussion by the courts as to the rate of speed at which vessels may move over grounds where others are likely to be at anchor, in the nighttime, or during a fog. I think the result of the decisions is, that it is incumbent upon navigators in such circumstances to move with caution and to keep their ships in trim and condition to be easily controlled and readily manoeuvred to meet any emergency that may be probable or liable to arise. The speed at which they are moving is not more important than this tactical condition of the ship. Some of the decisions on this point are those of The Frank, 2 Quebec Law R. 301; The Pepperell, Swab. 12; The Juliet Erskine, 6 Notes Cas. 633; The Europa, 14 Jurist, 627; The Virgil, 2 W. Rob. Adm. 201; The Thomas Martin [Case No. 13,926]; Amoskeag Manuf'g Co. v. John Adams [Id. 338]; and others.

Was the George Bell in the manageable condition which has been indicated, in sailing over the fishing-ground in which she ran down the Briha? I thing not. The St. George was sailing in the same waters, in the same fog, at the same time. Her master said in his evidence: "I was moving between three and four knots an hour, and had been going so since 2 a. m. It is my custom not to spread canvas in a fog when I am not on deck. On this occasion it was on account of the fog that I did not care to have more sail on. I had on two jibs and a stay-sail, topsails, and topgallant-sails. I was on deck from 6 p. m. till 3 a. m.; then went below, but did not go to bed. At 4 a. m. I went up and had a look at the weather. I went on deck again at a quarter to 6 a. m."

It is from this evidence of an accomplished mariner and thorough seaman that we may learn what was prudent to be done by a ship moving in those waters, in that fog, on that night and morning; and it confirms me in the belief that the master of the other ship, the colliding ship George Bell was not justifiable in spreading so much canvas as he had out on that occasion. The fact that his main and mizzen sails were spread, rendered his ship less responsive to the helm than it should have been when the helm was finally put hard aport. I doubt if that was the proper thing to do with the helm on the occasion, and I believe that that manoeuvre insured the collision, and justifies the principle of rule 19 (our rule 24), which authorizes a disobedience of express rules when "necessary to avoid immediate danger." I conclude that the ship was in fault in moving under too much canvas in the unmanageable condition in which she was at the time

of the collision. I do not think that the rate of speed under which a vessel is moving under such circumstances is to be so much considered as whether she is so trimmed and conditioned as to be readily manageable in case of an emergency. Nor was the master of the colliding ship otherwise as cautious and careful as the occasion required. He had turned in at 11 p. m., and was not again on deck until just before the moment of the collision, when it was too late for him to control his vessel. Yet, though the ship was at all the disadvantage which has been described, she could still have avoided the brig if proper measures had been taken to that end. If the lookout was at his post at the time the brig first became visible, he failed to do his duty. It seems from the second mate's testimony that five to eight minutes before the collision the lookout had gone below deck to get his coffee, and it is probable that when the men on the brig first saw the ship and rang their fog-bell, the ship's lookout was not at his post at all. And, if we are to believe Gibbons, whose testimony seems intelligent and consistent, the second mate, who was the officer of the watch on deck, was also at that time in the carpenter's shop at work at some job. These were the only witnesses that gave testimony who could have seen the brig from their positions on deck if they had been in place; for the helmsman was shut off from sight of the brig by the height of the unladen ship. These statements in the evidence establish the belief in my mind, that when the two vessels first became visible to each other there was no lookout in place on the ship's deck; and that after the lookout got to his place, and reported "a vessel under the lee bow," several minutes elapsed before the officer of the watch was in place to give the proper orders. The lookout's lusty blowing of his fog-horn "many times" during that important interval could accomplish no object but to summon the officer from the carpenter's shop, and seemed to be slow in effecting that; for no orders were given by this officer until just before the collision, when they were too late to be effectual for aught but causing the ship to strike the brig a glancing blow on the port-quarter instead of a direct blow amidships.

The collision ought not to have happened. I think the ship was in fault in no measures having been taken in time by those on her deck to avoid the accident. I think she was in fault in being under too much sail for those waters at that time, and in having her canvas spread in such a manner as to render her unmanageable in such a sudden emergency as was likely to arise at that time and place of the collision. I will sign a decree for the libellants.

[NOTE. Reference was made to a master to ascertain the damages. The case was heard on exceptions to the master's report as to the valuation of the vessel, outfit, and cargo, and the report was in general confirmed. 3 Fed. 581.]